MacDONALD CONSTRUCTION COMPANY, a Missouri corporation, and Tunnicliff Construction Company, an Iowa corporation, a Joint Venture, Plaintiffs,

v.

George W. WARNECKE, Defendant.

No. 60C 201(1).

United States District Court
E. D. Missouri, E. D.
Jan. 10, 1963.

---

Robert T. Hensley, Biggs, Hensley Curtis & Biggs, St. Louis, Mo., for plaintiffs.

George S. Roudebush, Bryan Cave, McPheeters & McRoberts, St. Louis, Mo., for defendant.

HARPER, Chief Judge.

This suit was instituted in the Circuit Court of the City of St. Louis by MacDonald Construction Company, a Missouri corporation, and Tunnicliff Construction Co., an Iowa corporation, a Joint Venture, plaintiffs, against George W. Warnecke, a citizen and resident of the State of New York, to recover $76,604.27. The suit was removed to this court and this court has jurisdiction since there is diversity of citizenship and more than $10,000.00 involved.

Before the trial plaintiffs abandoned their claim for $8,604.27 pertaining to a ten-inch sewer line built for defendant at Owega, New York. The case was tried to the court with the plaintiffs seeking to recover $68,000.00, with interest, consisting of $25,000.00 paid by plaintiffs for an easement and $43,000.00 paid by IBM to defendant for the right to discharge industrial waste into defendant's outfall sewer line, which latter sum the plaintiffs contend the defendant promised to pay to plaintiffs.

The plaintiffs, contractors, entered into a contract with defendant to build a sanitary sewage treatment plant and an outfall line from the plant at Owega, New York. After the sewage has been treated the product is called "effluent" and runs from the plant through the outfall line. The plaintiffs and defendant signed a contract (Plaintiffs' Exhibit 1), dated April 26, 1956, which the parties stipulated was the contract for the construction. At the time the construction began on the sewage plant in May of 1956, the plans were not fully completed, but in due time the plans were completed and presented to the State Board of Health for approval. The plant was completed in the fall of 1956, delivered to the defendant, and the contract price of $250,000.00 was paid by defendant to the plaintiffs.

The plaintiffs here seek to recover additional money arising out of the construction of the outfall line. The outfall line as built was built from the plant to the Susquehanna River, and in addition to carrying the effluent from the sewage plant, was cut into between the plant and the river by a line from the IBM plant for the purpose of emptying industrial waste from the IBM plant into the outfall line. It was not contemplated by the parties when the contract was originally negotiated and drafted that the outfall line would carry the industrial waste from the IBM plant.

The $43,000.00 figure which was paid by IBM to the defendant was paid as a result of negotiations in the latter part of 1956, resulting in an agreement whereby IBM paid to the defendant $43,000.00 for the right to build a line across a small part of the defendant's property and to

cut into the outfall line and discharge its industrial waste into it.

The defendant contends that under the contract the plaintiffs were entitled only to the $250,000.00 as provided by the contract, which has been paid.

The parties are in disagreement with respect to where the original outfall line was to discharge, the plaintiffs contending that as originally contemplated the outfall line would end at Barnes Creek some five to seven hundred feet from the sewage plant, the defendant contending that there was no specific agreement as to where the outfall line was to end, but that it was to be built to the Susquehanna River, if necessary.

The credible testimony discloses that it was originally contemplated that the line would end at Barnes Creek. The authorities for the State of New York in the early stages of the planning for the plant tentatively agreed that the line could end at Barnes Creek and the effluent be dumped into the creek. It was only after IBM planned the dumping of its industrial waste into Barnes Creek that the State of New York authorities withdrew their approval and indicated that the line would have to go to the Susquehanna River for the dumping of both the effluent and the industrial waste.

While at the trial the defendant would have one believe that the use of Barnes Creek was never definitely contemplated, but only hoped for, the exhibits in this case do not support defendant's position. The change of the end of the line from Barnes Creek occurred only after IBM sought to discharge its industrial waste into the creek. While this case was pending before the late Judge Weber, the defendant filed a motion for a change of venue, and in his memorandum in support of the motion, on Page 1, in setting forth the facts stated: "The effluent from the plant was to go into a creek 150 yards from the plant."

The original flow diagram (Plaintiffs' Exhibit 2) shows the line from the plant to Barnes Creek. Plaintiffs' Exhibit 4, a letter written by the defendant to IBM on September 26, 1956, has this to say:

"For your information I might add that in February and March, at the time the negotiations on the plant rental were finalized, we had assurance from the State without any conditions, that the discharge from the sanitary waste could be made into the creek. This was re-affirmed on another occasion. It was only when the effort was made to have the State approve the spilling of industrial waste into the creek with its possible toxic effects that the State rescinded the approval on the basis that if the industrial waste could not be dumped the sanitary could also not be dumped in order to treat both on an equal basis, although they acknowledge that the sanitary waste is of a grade which would not be harmful."

The length of the line as built to the Susquehanna River was some 3,200 feet in length, requiring the contractor to build a line twenty-five to twenty-seven hundred feet longer than had it been built to Barnes Creek. It was also necessary to secure the right of way beyond the creek on which to build the line. There is also a dispute between the parties as to whether the size of the outfall line was increased as a result of the accommodation of the IBM industrial waste. The defendant contends that the size of the line was not increased, but the credible testimony clearly discloses that the size of the line was changed from a ten-inch line to a twelve and fifteen-inch line to accommodate the added volume after it was agreed that the line would also carry the industrial waste.

Plaintiffs' Exhibit 24, a copy of a letter written by the defendant to IBM, completely refutes the testimony of the defendant that the size of the line was not increased. The letter written on September 20, 1956, refers to the fact that a ten-inch line was adequate and would have been approved by the state. Plans for the line as finally built were drafted by engineers furnished by the

defendant after the agreed change in the use of the line.

The defendant's testimony with respect to the size of the line is indicative of most of his testimony at the trial. Where there are documents dealing with the same subject matter his testimony was seldom supported by the documents. An examination of the affidavit filed by the defendant in support of the application for change of venue is further indicative of his testimony. In the affidavit he stated that in order to try the case he would have to have the testimony of eleven New York witnesses, yet at the trial not one of them was produced, either in person or by deposition. In fact, no depositions were taken of any of the eleven witnesses.

While the contract is dated April 26th, and both parties have agreed that it is the contract for the construction of the plant, the defendant did not sign the contract according to his testimony until December of 1956, after the construction of the plant had been completed and it had been approved by the State Department of Health of New York. Defendant's Exhibits E, F, G and H, however, indicate that the defendant probably did not sign the contract until late January, 1957. The defendant testified that he did not intend to be bound by the contract until the plant had been completed and was approved by the state. The defendant contends that the line was a part of the $250,000.00 contract, yet when the plaintiffs sent bills for the construction and included the $25,000.00 paid to Celeste for the right of way secured from Celeste used in the construction of the line (Plaintiffs' Exhibit 21) the defendant struck the figures from the bills on the basis such was not properly a part thereof (Plaintiffs' Exhibit 22).

The credible evidence in this case is to the effect that when the state authorities of New York withdrew their tentative approval of the outfall line to the creek and required that the outfall line be built to the Susquehanna River, the defendant told the plaintiffs' representatives to secure the necessary right of way and build the line and he would make them whole in the matter. He requested the plaintiffs' representatives to do the negotiating with Celeste for the right of way as he did not want to handle that phase of it. When the negotiations were completed he approved the price and had his attorneys handle the closing and the details of putting the right of way in his name. When IBM decided to try to reach an agreement for the use of the outfall line to dump its industrial waste the defendant requested the plaintiffs' representatives to handle the negotiations, stating that the plaintiffs would get the money since IBM had been responsible for having caused the line to be built to the river rather than to the creek. The representatives of the plaintiffs and IBM arrived at the $43,000.00 figure to be paid by IBM.

John F. Tunnicliff, one of the witnesses for the plaintiffs, testified that the $43,000.00 covered the cost of increasing the size of the line, increasing the length of it from the creek to the river, and the Celeste easement. While the defendant denies it, the more credible testimony is to the effect that the defendant promised to the plaintiffs the $43,000.00 paid by IBM. After the payment was made to the defendant by IBM and the plaintiffs' representatives inquired about it, the defendant suggested they split the $43,000.00, but the plaintiffs refused to do so.

The defendant contends that under the contract he owes nothing to the plaintiffs, but the contract and the exhibits support the plaintiffs' position rather than the defendant's. The exhibits clearly indicate that the line as finally built was not what was agreed to at the time the contract was initially negotiated, either as to length or size. The note attached by the defendant to Plaintiffs' Exhibit 4, a letter written by the defendant, sets out that the line was changed as a result of the industrial waste and so recognized by the defendant.

Defendant makes much of Article 5(A) of the contract (Plaintiffs' Exhibit 1), but the contract is for the construction of

a sewage plant on the owner's property. Article 5(A) follows Article 5, and is an addition made by the defendant. When we examine Article 5 we find that it is that part of the contract whereby the owners agrees to reimburse the contractor for funds incurred in the proper execution of the *work*. Easements required for right of way purposes do not fall in the category of "work." An examination of Article 15 of the General Conditions of the Contract for the Construction of Buildings discloses that the last paragraph of Article 15 was stricken at the same time Article 5(A) was added. Had the last paragraph of Article 15 not been stricken, it would have been in conflict with Article 5(A), but here again, Article 15 in the General Conditions of the contract, as well as Article 5 and 5(A) in the first part of the contract, deals with *work*—in other words, the actual construction.

Article 11, Page 3, of the General Conditions of the contract, provides that easements for permanent structures shall be secured and paid for by the owner (defendant), unless otherwise specified. The first page of the contract provides that the plant is to be built on the owner's (defendant's) property. Nowhere in the contract is there any indication, direct or otherwise, that the plaintiffs were to furnish any of the property or easements upon which the plant and the line would be built, Article 5(A) notwithstanding.

The defendant with respect to his contention that plaintiffs were required to secure and pay for the Celeste right of way, in addition to relying on Article 5(A), places great emphasis on Defendant's Exhibit B, a memorandum dictated by John F. Tunnicliff for defendant on March 2, 1956. The court does not so read Exhibit B. The defendant has placed special emphasis on this exhibit, particularly the last page, by underlining the reference to the easements, one of which was the Celeste farm. The defendant, however, ignores what the memorandum says. On the last page Tunnicliff said to the defendant, "We will also *require three further easements*." The memorandum does not say, "We will *acquire*," but rather, "We will *require*." The memorandum nowhere provides that the plaintiffs will acquire any easements, but rather says *will require*. To the court this memorandum supports the plaintiffs' position with respect to their being entitled to payment for the Celeste easement. The plaintiffs are entitled to recover the $25,000.00 paid for the Celeste easement.

The outfall line as finally built was built larger than originally contracted for, solely for the purpose of handling the industrial waste of IBM. The more credible evidence indicates that when the matter came up with respect to the handling of the industrial waste the defendant realized it presented him with an opportunity to recover from IBM the additional cost of the line due to added length and easements which were not originally contemplated. He told the plaintiffs' representatives that they were entitled to what could be obtained from IBM for dumping industrial waste into the line to cover the additional cost of the line, and that they should not agree in their negotiations with IBM on any figure which would not make them whole.

While the estimates with respect to the increase of the cost of the line due to the easements, additional length, and additional size as a result of accommodating the industrial waste, were from forty-five to sixty thousand dollars, according to the witness Tunnicliff it was finally agreed between the representatives of the plaintiffs and IBM that they would settle on the figure of $43,000.00. While the defendant contends the line as built was what was contracted for, the evidence refutes this. The exhibits as previously set out clearly show the line was built larger than originally planned so as to carry the industrial waste. While there is dispute as to whether the line was contracted for to the creek or the river, the better testimony indicates it was initially contemplated and approved for construction to the creek.

The plaintiffs are entitled to recover the additional cost of the outfall line they were required to build beyond what was originally contracted for. Tunnicliff testified that $43,000.00 covered the cost of the Celeste easement, the additional length of the line from some five to seven hundred feet to approximately thirty-two hundred feet, and the increase in the size of the line to accommodate the industrial waste. To permit the plaintiffs to recover for the amount for which they sued would be to permit the recovery of the cost of the Celeste easement twice. The court accordingly finds for the plaintiffs in the sum of $43,000.00, with interest from the filing of this lawsuit.

The court will adopt this memorandum opinion as its findings of facts and conclusions of law, and the clerk will prepare a judgment consistent with this opinion and submit same to the court for signature and entry.